IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-CV-98-D

COREY COLEY, JR.,                          )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )          **ORDER**
                                           )
NATIONAL COLLEGIATE ATHLETIC               )
ASSOCIATION,                               )
                                           )
                    Defendant.             )

On February 21, 2025, Corey Coley, Jr. ("Coley" or "plaintiff") filed a complaint against the National Collegiate Athletic Association ("NCAA" or "defendant") [D.E. 1]. Coley seeks a declaratory judgment that NCAA Division I Bylaws 12.02.06, 12.8, 12.8.3.1., and 12.8.3.1.6 (collectively, the "Challenged Bylaws") violate section 1 of the Sherman Antitrust Act (the "Sherman Act"). See id. at ¶¶ 1, 96–122; 15 U.S.C. § 1.[1] Coley also seeks preliminary and permanent injunctive relief enjoining the NCAA from enforcing the Challenged Bylaws against him. See id. Essentially, the Challenged Bylaws give student athletes five calendar years to play four seasons. Coley has used his eligibility under the Challenged Bylaws but wants to play another season of football at North Carolina State University ("NCSU") and earn money from NCSU's name, image, and likeness ("NIL") collective. On February 25, 2025, Coley moved for an

---

[1] Coley's complaint lists NCAA Division I Bylaw 12.8.3.1.7 as the "Minimum Amount of Competition, as applied to football." Compl. ¶ 1. NCAA Division I Bylaw 12.8.3.1.7, however, sets the minimum amount of competition for men's wrestling. See [D.E. 1-2] 70. NCAA Division I Bylaw 12.8.3.1.6 sets the minimum amount of competition for Division I football, see id., and the remainder of Coley's complaint refers to NCAA Division I Bylaw 12.8.3.1.6 as the bylaw at issue. See Compl. ¶¶ 5 n.2, 28, 115.

extraordinary, mandatory preliminary injunction [D.E. 8] and filed a memorandum in support [D.E. 9]. On March 27, 2025, the NCAA responded in opposition [D.E. 17]. On April 10, 2025, Coley replied [D.E. 18]. On April 18, 2025, the NCAA moved to strike or disregard portions of Coley's reply [D.E. 19] and filed a memorandum in support [D.E. 20]. On April 25, 2025, Coley responded in opposition [D.E. 21].

As explained below, Coley's reply contains impermissible new arguments that Coley failed to raise in his opening brief. Thus, the court grants the NCAA's motion to disregard portions of Coley's reply. Moreover, Coley has failed to demonstrate his entitlement to an extraordinary, mandatory preliminary injunction requiring the NCAA to permit Coley an additional year of eligibility and enjoining the NCAA from enforcing the Challenged Bylaws against Coley. Accordingly, the court denies Coley's request for a preliminary injunction.

## I.

Coley is a student and college football player at NCSU in Raleigh, North Carolina where he plays cornerback. See Compl. [D.E. 1] ¶¶ 15, 33–35, 39. College football programs "heavily recruited" Coley out of high school, and Coley "committed to attend and play Division I football at the University of Maryland." Id. at ¶ 32. Coley arrived at the University of Maryland in 2021 and expected to "redshirt" his freshman season. See id. at ¶ 33; [D.E. 9] 4. But injuries in Maryland's secondary required Coley to play. In the 2021–22 season, Coley played in nine games "for a total of 230 snaps on defense as cornerback" and occasionally played on the special teams. Compl. ¶ 33; see [D.E. 9] 4.

During the 2022–23 season, Coley played in 10 games for "291 snaps at cornerback." Compl. ¶ 34. Coley also suffered a serious knee injury. See id. at ¶ 34; [D.E. 9] 4. During the

2

2023–24 season, Coley played in 10 games with "305 snaps at cornerback." See Compl. at ¶ 35. During that season, Coley's uncle died, and Coley felt isolated. See id.

During the 2024–25 season, Coley entered the transfer portal and transferred to NCSU to play his senior year. See id. at ¶ 36; [D.E. 9] 5. At the University of Maryland, Coley did not receive any NIL compensation. See Compl. ¶ 37. At NCSU, however, Coley received NIL compensation from "1PACK, NCSU's [NIL] collective that connects fans, alumni, businesses and charities with athletes at NCSU." Id.

As the 2024 season began, Coley endured mental health struggles and a "nagging ankle," and Coley began "the 2024 season in a lower place, mentally, than he had ever been." Compl. ¶ 38. Like Coley's freshman year, however, injuries decimated the team's secondary, and the team needed Coley to play. See [D.E. 9] 5. Thus, Coley "pushed through" and played in six games at NCSU during the 2024–25 season. Id. Unfortunately, on Coley's fifth defensive snap in the sixth game of the 2024–25 season, Coley suffered a season-ending injury. See Compl. ¶ 39; [D.E. 9] 5. During the 2024–25 season, Coley played in six games for a "total of 213 snaps at cornerback while also playing on special teams." Compl. ¶ 39.

Coley remains enrolled at NCSU and "is on track to complete his degree by the end of 2025." Compl. ¶ 41. Coley and NCSU want "Coley to return to NCSU and play football during the 2025–26 college football season, and Coley wants to return to NCSU where he not only has the opportunity to play football and earn additional NIL [c]ompensation through NCSU's collective, 1PACK, but also [to] continue his academic endeavors." Id. at ¶ 42; see [D.E. 9] 6. The Challenged Bylaws prevent Coley from playing another season. See Compl. ¶¶ 2–11; [D.E. 9] 2–4; [D.E. 17] 2–3. The Challenged Bylaws state in relevant part:

3

**12.02.06 Intercollegiate Competition.** Intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution does any of the following:

(a) Represents the institution in any contest against outside competition, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;

(b) Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or

(c) Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

...

**12.8 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:

**12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted . . . .

...

**12.8.3.1 Minimum Amount of Competition.** Any competition, regardless of time, during a season in an intercollegiate sport shall be counted as a season of competition in that sport, except as provided in Bylaws 12.8.3.1.1, 12.8.3.1.2, 12.8.3.1.3, 12.8.3.1.4, 12.8.3.1.5 and 12.8.3.1.6. This provision is applicable to intercollegiate athletics

...

**12.8.3.1.6 Exception -- Football.** In football, a student-athlete representing a Division I institution may compete in up to four contests in a season without using a season of competition.

[D.E. 1-2] 46, 66–70 (cleaned up).

4

The Challenged Bylaws prohibit student-athletes from playing in more than four seasons of intercollegiate Division I sports within five years. See id.; Compl. ¶ 1. As applied to football, a Division I football player uses a season of eligibility once he has appeared in more than four games in a season. See NCAA Division I Bylaw 12.8.3.1.6 (the "Redshirt Rule"); [D.E. 1-2] 70. In other words, a Division I football player burn one season of eligibility (from his total of four seasons of eligibility) once he plays in more than four games in a single season. Once a player has exhausted his four seasons of eligibility, the NCAA enforces the Challenged Bylaws against the player and prohibits an additional season of play. See NCAA Division I Bylaw 12.8 et seq.; Compl. ¶ 1; [D.E. 1-2] 66–70. A player who has exhausted his eligibility may apply to the NCAA for a hardship waiver. See Compl. ¶ 30; NCAA Division I Bylaw 12.8.4.

After the 2024–25 season, Coley exhausted his four seasons of eligibility. See Compl. ¶¶ 32–40; [D.E. 17] 2. In December 2024, NCSU and Coley applied to the NCAA for a hardship waiver to grant Coley an additional year of eligibility. See Compl. ¶ 43; [D.E. 1-4]. In the waiver application, NCSU "represented that Coley had endured hardship in every year of his collegiate enrollment" at both the University of Maryland and NCSU. Compl. ¶ 43; see [D.E. 1-4] 4. Additionally, NCSU argued that the NCAA should consider "Coley's collective struggles, both mentally and physically, throughout his collegiate career," in reviewing Coley's waiver application. See Compl. ¶ 44; [D.E. 1-4] 4.

On February 6, 2025, the NCAA denied Coley's waiver application. See Compl. ¶ 48; [D.E. 1-5]. On February 8, 2025, the NCAA issued a new decision to correct an inaccuracy in its February 6, 2025 decision. See Compl. ¶ 48; [D.E. 1-6]. This new decision also denied Coley's waiver application. See Compl. ¶ 48; [D.E. 1-6].

5

On February 21, 2025, Coley sued the NCAA. Coley argues that the Challenged Bylaws violate section 1 of the Sherman Act because they "unjustifiably restrain competition." Compl. ¶ 7. Specifically, Coley argues that the Challenged Bylaws "violate the Sherman Act, by wrongfully and arbitrarily defining a season of competition as one in which an athlete has appeared in any contest, unless the athlete appears in less than an arbitrarily designated four . . . games." Id. at ¶ 57. According to Coley, his "window of opportunity to continue to play football at NCSU from which he can earn substantial NIL [c]ompensation is closing." Id. at ¶ 50. Thus, Coley seeks to enjoin the NCAA from enforcing the Challenged Bylaws against him. See [D.E. 8] 1–3.

In opposition, the NCAA argues that the court should deny Coley's request for a preliminary injunction (1) because Coley cannot show that he will suffer irreparable harm absent the requested preliminary injunction; and (2) because Coley's allegations "do not implicate and/or violate" the Sherman Act. [D.E. 17] 1. Thus, according to the NCAA, Coley cannot demonstrate a likelihood of success.

## II.

"A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." Starbucks Corp. v. McKinney, 602 U.S. 339, 345 (2024) (quotations omitted); see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Plaintiffs seeking a preliminary injunction must "demonstrate that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013); see Starbucks Corp., 602 U.S. at 346; Winter, 555 U.S. at 20; 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC, --- F.4th ---, No. 24-2245, 2025 WL 1584984, at *2 (4th Cir. June 5, 2025); Centro Tepeyac

6

v. Montgomery Cnty., 722 F.3d 184, 188 (4th Cir. 2013) (en banc). Courts consider each factor separately, and the movant must prove each factor "as articulated." Pashby, 709 F.3d at 320–21 (quotation omitted).

Generally, a preliminary injunction seeks to preserve "the status quo so that a court can render a meaningful decision after a trial on the merits." Hazardous Waste Treatment Council v. South Carolina, 945 F.2d 781, 788 (4th Cir. 1991) (quotation omitted). A mandatory preliminary injunction, however, "alter[s] the status quo." League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). The law disfavors "[m]andatory preliminary injunctive relief." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994) (quotation omitted). Such relief "goes well beyond simply maintaining the status quo pendente lite," and is "warranted only in the most extraordinary circumstances." Id.; see In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525–26 (4th Cir. 2003) abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006). "[A] mandatory preliminary injunction must be necessary both to protect against irreparable harm in deteriorating circumstances created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." Id. at 526. If a plaintiff fails to demonstrate both requirements, then a court should not enter a preliminary injunction." See id.

"The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The notice requirement ensures the adverse party has "a fair opportunity to oppose the application and to prepare for such opposition." Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 432 n.7 (1974). Rule 65 does not expressly require an evidentiary hearing and oral argument. See, e.g., Fundamental Admin. Servs., LLC v. Anderson, No. 13-1708, 2015 WL 2340831, at *1 (D. Md. May 13, 2015) (unpublished).

7

**A.**

Coley argues that <u>National Collegiate Athletic Association v. Alston,</u> 594 U.S. 69 (2021), renders the NCAA's Bylaws subject to scrutiny under the Sherman Act. <u>See</u> [D.E. 9] 10–14. Specifically, Coley argues that the NCAA and its members institutions "participate in an agreement" concerning the Challenged Bylaws, and that the Challenged Bylaws "unreasonably restrain competition in the relevant [Division I college football] market." <u>Id.</u> at 9. In support, Coley relies on <u>Pavia v. National Collegiate Athletic Association,</u> 760 F. Supp. 3d 527 (M.D. Tenn. 2024), <u>appeal filed</u> <u>Diego Pavia v. National Collegiate Athletic Association,</u> No. 24-6153 (6th Cir. Dec. 26, 2024), to bolster his argument that the Challenged Bylaws violate section 1 of the Sherman Act. <u>See id.</u> at 13–14. In <u>Pavia,</u> the United States District Court for the Middle District of Tennessee held that the NCAA's "restrictions on who is eligible to play and therefore to negotiate NIL agreements [are] . . . commercial in nature" and likely violate section 1 of the Sherman Act. <u>See Pavia,</u> 760 F. Supp. 3d at 537.

In opposition, the NCAA argues that courts "have consistently found that NCAA eligibility rules are not commercial in nature and therefore are not subject to antitrust scrutiny." [D.E. 17] 11. Likewise, the NCAA argues that the Challenged Bylaws fall outside the Sherman Act because they "are explicitly non-commercial" and "merely establish who can compete in intercollegiate athletic competition and for how long." <u>Id.</u> at 12 (cleaned up). Although the NCAA concedes that <u>Alston</u> subjected the NCAA's rules concerning NIL compensation to antitrust scrutiny, the NCAA argues that the Court limited its decision to "compensation" rules and did not address whether eligibility rules implicate the Sherman Act. <u>Id.</u> at 14 (citing <u>Alston,</u> 594 U.S. at 80, 82–83). According to the NCAA, <u>Alston</u> left undisturbed the rulings of several lower courts that the

8

Sherman Act does not apply to the NCAA's "true eligibility rules." Id. Furthermore, the NCAA argues that the district court in Pavia "incorrectly interpreted Alston as finding that any NCAA rule impacting a student-athlete's ability to earn NIL compensation, whether directly or indirectly, is commercial in nature." Id. at 14–15. Moreover, the NCAA cites Goldstein v. National Collegiate Athletic Association, No. 3:25-CV-27, 2025 WL 662809, at *3–7 (M.D. Ga. Feb. 28, 2025) (unpublished), to bolster its argument that the Challenged Bylaws are non-commercial and therefore not subject to the Sherman Act. See [D.E. 17] 16–17.

Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. The Court has long held that "restraint of trade" means "undue restraint." Alston, 594 U.S. at 81; see Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 98 (1984); Arizona v. Maricopa Cnty. Med. Soc., 457 U.S. 332, 342–43 (1982); Nat'l Soc. of Pro. Eng'rs v. United States, 435 U.S. 679, 687–88 (1978); Bd. Of Trade of Chi. v. United States, 246 U.S. 231, 238 (1918). The Sherman Act, however, does not apply to "every contract, combination, or conspiracy that restrains trade." Va. Vermiculite, Ltd. v. W.R. Grace & Co.- Conn., 965 F. Supp. 802, 812 (W.D. Va. 1997), rev'd on other grounds, 156 F.3d 535 (4th Cir. 1998).

Non-commercial behavior or rules fall outside the Sherman Act. See, e.g., Apex Hosiery Co. v. Leader, 310 U.S. 469, 493 (1940); Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 432–33 (6th Cir. 2008); Worldwide Basketball & Sport Tours, Inc. v. Nat'l Collegiate Athletic Ass'n, 388 F.3d 955, 958 (6th Cir. 2004); Vermiculite, 156 F.3d at 540–41; United States v. Brown Univ., 5 F.3d 658, 667 (3d Cir. 1993); cf. O'Bannon v. Nat'l Collegiate Athletic Ass'n,

9

802 F.3d 1049, 1064–65 (9th Cir. 2015) (holding that NCAA compensation rules regulate commercial activity and are more than non-commercial "eligibility rules"). To determine whether the Challenged Bylaws "are commercial in nature," the court asks, "whether <u>the rule itself</u> is commercial, not whether the entity promulgating the rule is commercial." <u>Worldwide Basketball & Sport Tours</u>, 388 F.3d at 959 (emphasis added); <u>see Vermiculite</u>, 156 F.3d at 541. Thus, the court focuses on whether the Challenged Bylaw are commercial, not the NCAA's commercial status.

Coley argues that because <u>Alston</u> opened the door for student-athletes to earn NIL compensation, any NCAA rule that burdens (even incidentally) a student-athlete's ability to earn NIL compensation "[is] commercial in nature." [D.E. 18] 4. In other words, Coley theorizes that "athletes can now earn NIL compensation[;] [therefore], rules that affect their eligibility—and consequently their access to the market for NIL compensation—are commercial in nature." <u>Osuna v. Nat'l Collegiate Athletic Ass'n</u>, No. 3:25-CV-62, 2025 WL 684271, at *3 (E.D. Tenn. Mar. 3, 2025) (unpublished).

The court recognizes that <u>Alston</u> changed the game to the extent that the Supreme Court eliminated the NCAA's ability to restrict what "education-related benefits" colleges could provide as compensation to student-athletes. <u>Alston,</u> 594 U.S. at 74. But the Supreme Court in <u>Alston</u> did not subject all the NCAA's Division I Bylaws to antitrust scrutiny. Rather, in <u>Alston,</u> the Court addressed "only a narrow subset of the NCAA's compensation rules—namely, the rules restricting the education-related benefits that student athletes may receive, such as post-eligibility scholarships at graduate or vocational schools." <u>Id.</u> at 108 (Kavanaugh, J., concurring). Moreover, lower courts have long resolved antitrust challenges to the NCAA's Division I Bylaws by deciding

10

whether a particular challenged rule is commercial (and therefore subject to the Sherman Act) or noncommercial (and therefore outside the Sherman Act's scope). See, e.g., In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig., 958 F.3d 1239, 1253–55 (9th Cir. 2020), aff'd sub nom. Alston, 594 U.S. 69; Deppe v. Nat'l Collegiate Athletic Ass'n, 893 F.3d 498, 502–04 (7th Cir. 2018); O'Bannon, 802 F.3d at 1064; Agnew v. Nat'l Collegiate Athletic Ass'n, 683 F.3d 328, 340–45 (7th Cir. 2012); Bassett, 528 F.3d at 430, 433; Smith v. Nat'l Collegiate Athletic Ass'n, 139 F.3d 180, 184–87 (3d Cir. 1998), vacated on other grounds by Nat'l Collegiate Athletic Ass'n v. Smith, 525 U.S. 459 (1999); Pavia, 760 F. Supp. 3d at 536–37; Elad v. Nat'l Collegiate Athletic Ass'n, No. CV 25-1981, 2025 WL 1202014, at *7 (D.N.J. Apr. 25, 2025) (unpublished); Osuna, 2025 WL 684271, at *3–4; Goldstein, 2025 WL 662809, at *3–4; Brantmeier v. Nat'l Collegiate Athletic Ass'n, No. 1:24-CV-238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) (unpublished). Alston did not change this analysis.

Alston does not compel this court to conclude that the Sherman Act applies to the Challenged Bylaws simply because the Challenged Bylaws indirectly affect a student-athlete's ability to earn NIL compensation. Moreover, courts have long refused to subject the NCAA's "eligibility rules" to antitrust scrutiny. See, e.g., Bassett, 528 F.3d at 433; Smith, 139 F.3d at 185; O'Bannon, 802 F.3d at 1066; Pennsylvania v. Nat'l Collegiate Athletic Ass'n, 948 F. Supp. 2d 416, 426–28 (M.D. Pa. 2013); Adidas Am., Inc. v. Nat'l Collegiate Athletic Ass'n, 40 F. Supp. 2d 1275, 1285–87 (D. Kan. 1999); Gaines v. Nat'l Collegiate Athletic Ass'n, 746 F. Supp. 738, 743–45 (M.D. Tenn. 1990); Jones v. Nat'l Collegiate Athletic Ass'n, 392 F. Supp. 295, 303–04 (D. Mass. 1975); Osuna, 2025 WL 684271, at *3–4; Goldstein, 2025 WL 662809, at *3–4. Alston did not overrule these cases or the distinction they draw between commercial rules and rules that

11

merely set eligibility requirements. Thus, the court rejects Coley's argument that <u>Alston</u> subjects all NCAA Division I Bylaws rules that affect a player's ability to earn NIL compensation to antitrust scrutiny.

Here, the Challenged Bylaws "are true eligibility rules because they limit the number of years that student-athletes may place collegiate sports." <u>Goldstein,</u> 2025 WL 662809, at *3; <u>see</u> <u>O'Bannon,</u> 802 F.3d at 1066. The Challenged Bylaws set a fixed number of seasons and games during which a Division I student-athlete may play college football. Although the Challenged Bylaws prevent Coley from earning NIL compensation at NCSU by preventing him from playing an additional season, the Challenged Bylaws do not regulate commercial activity. Rather, the Challenged Bylaws merely say who can play college football and for how long. On this record, the Challenged Bylaws are not commercial and therefore not subject to antitrust scrutiny.

If Coley were correct and the Challenged Bylaws violated the Sherman Act, what NCAA Division I Bylaws would not violate the Sherman Act? Under Coley's theory, all NCAA Division I Bylaws that could potentially affect a player's ability to earn NIL compensation would violate the Sherman Act. Such bylaws would include those that (1) set minimum academic requirements for players, <u>see</u> [D.E. 1-2] 151 (NCAA Division I Bylaw 14.01.2.1.); (2) prohibit the use of illegal drugs, <u>see</u> [D.E. 1-2] 35 (NCAA Division I Bylaw 10.2); (3) prohibit sports wagering by student-athletes, <u>see</u> [D.E. 1-2] 35 (NCAA Division I Bylaw 10.3); (4) permit disciplinary proceedings against student-athletes that could result in suspension or termination, <u>see</u> [D.E. 1-2] 36 (NCAA Division I Bylaw 10.4); or (5) set enforceable ethical standards for student-athletes and their institutions. <u>See</u> [D.E. 1-2] 354–60 (NCAA Division I Bylaw 19.12 <u>et seq.</u>). This court declines to interpret <u>Alston</u> or the Sherman Act to compel this nonsensical outcome.

12

The court realizes that some other courts have reached a different conclusion. See, e.g., Elad, 2025 WL 1202014, at *10–11; Pavia, 760 F. Supp. 3d at 535–45. In light of Alston's careful analysis of the NCAA's "compensation" rules, the court concludes that the Sherman Act does not apply to the eligibility rules in the Challenged Bylaws. The Court's decision in Alston "is more scalpel than ax," trimming away the NCAA's rules that unduly restrain commerce while leaving in place non-commercial rules, such as eligibility rules. Goldstein, 2025 WL 662809, at *4; see Alston, 594 U.S. at 81. Because the Sherman Act does not apply to the eligibility rules in the Challenged Bylaws, Coley cannot establish a likelihood of success on the merits. Accordingly, the court denies Coley's motion for an extraordinary, mandatory preliminary injunction.

## B.

Alternatively, even if the Sherman Act applies to the Challenged Bylaws, Coley cannot establish that the Challenged Bylaws have a substantial anticompetitive effect. Section 1 of the Sherman Act prohibits anticompetitive agreements. See 15 U.S.C. § 1; Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007); Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006). Some agreements are deemed so anticompetitive that they are per se illegal. See, e.g., Texaco, 547 U.S. at 5; Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49–50 (1990) (per curiam); United States v. New Wrinkle, Inc., 342 U.S. 371, 378–80 (1952). Other agreements are presumptively anticompetitive and courts apply "quick-look" scrutiny. See FTC v. Actavis, Inc., 570 U.S. 136, 159 (2013); California Dental Ass'n v. FTC, 526 U.S. 756, 769–70 (1999); N. Carolina State Bd. of Dental Examiners v. F.T.C., 717 F.3d 359, 373 (4th Cir. 2013), aff'd, 574 U.S. 494 (2015); Cont'l Airlines, Inc. v. United Airlines, 277 F.3d 499, 508–09 (4th Cir. 2002). Generally, however, courts "presumptively appl[y] [the] rule of reason analysis, under which antitrust plaintiffs must

13

demonstrate that a particular contract or combination is in fact unreasonable and anticompetitive before it will be found unlawful." Texaco, 547 U.S. at 5; see Leegin, 551 U.S. at 885; Cont'l Airlines, 277 F.3d at 509; United States v. Microsoft Corp., 253 F.3d 34, 58–59 (D.C. Cir. 2001) (en banc) (per curiam).

In describing the rule of reason, the Court "has sometimes spoken of a three-step, burden-shifting framework as a means for distinguishing between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." Alston, 594 U.S. at 96 (cleaned up); see Ohio v. Am. Express Co., 585 U.S. 529, 540–42 (2018). Coley initially must "prove that the [Challenged Bylaws] ha[ve] a substantial anticompetitive effect." Alston, 594 U.S. at 96 (quotation omitted). Coley may choose to demonstrate any alleged substantial anticompetitive effect by direct or indirect evidence. See Am. Express Co., 585 U.S. at 542. If Coley carries his burden, then "the burden shifts to the [NCAA] to show a procompetitive rationale for the restraint." Alston, 594 U.S. at 96 (quotation omitted). Finally, if the NCAA carries its burden, "the burden shifts back to [Coley] to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." Id. (quotation omitted).

Initially, Coley must clearly show that the Challenged Bylaws preventing him from a fifth year of eligibility have a "substantial anticompetitive effect that harms consumers in the relevant market." Am. Express Co., 585 U.S. at 541. The court assumes that the relevant market is "the labor market for Division I college football players." [D.E. 9] 17. Coley "focuses primarily on indirect evidence," and argues that the Challenged Bylaws have a substantial anticompetitive effect

on the relevant labor market by prohibiting a fifth year of eligibility for Coley and "student-athletes like Coley." Id. at 17–19.

In support of his motion for an extraordinary, mandatory preliminary injunction, Coley submitted (1) the declaration of Henry Baker ("Baker"), Coley's former coach, see [D.E. 9-2]; (2) Coley's own declaration, see [D.E. 9-3]; (3) the declaration of Reid Johnson ("Johnson"), a representative from NCSU's NIL collective, see [D.E. 9-4]; and (4) the declaration of Colby McDonald ("McDonald"), Coley's former teammate, see [D.E. 9-5].

The NCAA responds that Coley fails to sufficiently allege facts supporting his claim that the Challenged Bylaws have a substantial anticompetitive effect in the labor market for Division I college football players. See [D.E. 17] 17–20. Specifically, the NCAA argues that Coley "has not alleged facts showing a market-wide impact of the NCAA's Challenged [Bylaws]." Id. at 17. Furthermore, the NCAA argues that Coley "has provided no expert economic analysis—or any economic analysis at all—supporting his position" that the Challenged Bylaws have a substantial anticompetitive effect. Id. at 18. According to the NCAA, "[n]one of [Coley's] supporting declarations establish[] that the Challenged [Bylaws] lessen [the] total benefits student-athletes receive from schools, including tuition, cost of attendance . . . [or] reduce the total number of intercollegiate competition opportunities or participation; or reduce the quality of offerings in the alleged market." Id. at 19. Moreover, the NCAA argues that the Challenged Bylaws "do not reduce the number of spots available for alleged market participants," and that the Challenged Bylaws "have the same effect as other true eligibility rules." Id. at 19–20. The NCAA filed the declaration of Jennifer Henderson ("Henderson"), the Managing Director of the NCAA, to explain the structure of the NCAA and the purposes of its eligibility rules. See [D.E. 17-1].

The NCAA also submitted the declaration of Dr. Charles Murry ("Dr. Murry"), an economist with expertise in industrial organization, "which includes antitrust economics, vertical relationships between suppliers and retailers, and the economics of product markets and competition." [D.E. 17-1] ¶ 3. In his declaration, Dr. Murry opines that Coley fails to "substantiate his claims" that the Challenged Bylaws "result in anticompetitive harm." Id. at ¶ 12. Dr. Murry also opines that Coley offers evidence of economic harm only to himself and fails to provide evidence of any market-wide anticompetitive effect from the Challenged Bylaws. See id. at ¶¶ 13–16. Moreover, Dr. Murry opines that Coley fails to adequately evaluate the procompetitive benefits of the Challenged Bylaws. See id. at ¶¶ 17–24.

In reply, Coley largely repeats his argument that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. See [D.E. 18] 4–7. According to Coley, "[u]sing its market power, the NCAA uses the Challenged [Bylaws] to restrain trade and limit the available talent pool for college football. Coley contends that the anticompetitive effects are obvious, and that the development of a further record of that will not reveal any other conclusion." Id. Despite Coley's contention that he need not develop the record any further, Coley attached to his reply brief the declaration of Dr. Joel G. Maxcy ("Dr. Maxcy"), "an economist with expertise in the fields of sports business, industrial organization, and labor economics." [D.E. 18-1] ¶ 1. Coley also filed an ESPN article about college hockey players to support his argument that the Challenge Bylaws lack a procompetitive justification. See [D.E. 18] 8–9; [D.E. 18-2].

In his declaration, Dr. Maxcy opines that the Challenged Bylaws "are commercial because they regulate an essential component of . . . Division I football, namely, eligibility." Id. at ¶ 33.

16

Dr. Maxcy also provides his own rule of reason analysis, refutes the NCAA's declarations, and concludes that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. See id. at ¶¶ 29–71.

The NCAA moves to strike or disregard Dr. Maxcy's declaration and the ESPN article. See [D.E. 19]. The NCAA argues that the court should strike or disregard Dr. Maxcy's declaration and the ESPN article because "[t]hese exhibits are new evidence that [were] not referenced or submitted with plaintiff's motion for preliminary injunction." Id. at 1. Alternatively, the NCAA seeks leave to file a surreply to address Dr. Maxcy's declaration and the ESPN article. See id.

In opposition, Coley argues that Dr. Maxcy's declaration and the ESPN article respond to contentions that the NCAA raised in its response in opposition. See [D.E. 21] 2–7. Coley also argues that Dr. Maxcy's declaration and the ESPN article support arguments Coley already raised in his complaint and in his motion for a preliminary injunction. See id. Furthermore, Coley argues that the court should not grant the NCAA leave to file a surreply because "[t]here is nothing new that is raised within [Coley's] [r]eply." Id. at 2. Moreover, Coley argues that if the court agrees with the NCAA, the court should disregard Dr. Maxcy's declaration and the ESPN article, not strike them. See id. at 1–2, 21.

Generally, a party cannot raise new arguments in a reply brief. "A contrary rule runs the risk of depriving a nonmovant an opportunity to respond." De Simone v. VSL Pharms., Inc., 36 F.4th 518, 531 (4th Cir. 2022) (cleaned up); see United States v. Smalls, 720 F.3d 193, 197 (4th Cir. 2013); United States v. Al–Hamdi, 356 F.3d 564, 571 n.8 (4th Cir. 2004); Slominski v. Globe Life Inc., No. 7:23-CV-1081, 2024 WL 556978, at *6 n.3 (E.D.N.C. Feb. 12, 2024) (unpublished); United States v. Ballard, 708 F. Supp. 3d 717, 742 (E.D.N.C. 2023), appeal dismissed, No. 24-

17

6172, 2024 WL 5431480 (4th Cir. Dec. 11, 2024) (unpublished). When Coley filed his motion for a preliminary injunction, Coley knew that he would have to show a likelihood of success on the merits of his claim under the Sherman Act. To do so, the rule of reason analysis requires Coley to first make a clear showing that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. See [D.E. 9] 14–19. Coley attempted to carry his burden with "indirect" evidence and offered the declarations of Baker, Johnson, and McDonald in support of his argument that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. Coley, however, did not offer any expert economic analyses or provide any market-wide data for the court's consideration. In its response, the NCAA noted that Coley failed to offer such economic evidence. See [D.E. 17] 18 & n.16.

After the NCAA critiqued Coley's filings for lacking expert economic analysis, Coley replied and offered Dr. Maxcy's declaration and the ESPN article. Indeed, Dr. Maxcy's declaration and the ESPN article represent the total evidence Coley offered concerning the Challenged Bylaws' effect on the wider labor market. Far from simply responding to the NCAA's response, Dr. Maxcy's declaration offers novel arguments concerning why the court should grant Coley's motion for an extraordinary, mandatory preliminary injunction. Likewise, the ESPN article concerns an entirely different labor market (i.e., the labor market for Division I hockey players) than the labor market at issue in this case (i.e., the labor market for Division I college football players).

Dr. Maxcy's declaration and the ESPN article could have supported Coley's burden to establish a likelihood of success on the merits had Coley included them with his initial

18

memorandum in support of his request for a preliminary injunction. Coley, however, did not. Instead, Coley sandbagged the NCAA and deprived the NCAA of the opportunity to consider either. If the court considered either Dr. Maxcy's declaration or the ESPN article, it would impermissibly deprive the NCAA of the opportunity to respond. See De Simone, 36 F.4th at 531; Smalls, 720 F.3d at 197; Al–Hamdi, 356 F.3d at 571 n.8; Slominski, at 2024 WL 556978, at *6; Ballard, 708 F. Supp. 3d at 742. The court declines to do so. Accordingly, the court grants the NCAA's motion to disregard Dr. Maxcy's declaration and the ESPN article.

With Dr. Maxcy's declaration and the ESPN article properly excluded from the court's consideration, the court addresses the rule of reason analysis. Coley cannot satisfy his initial burden under the rule of reason analysis because Coley fails to offer sufficient evidence that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. The declarations of Baker and Johnson concern only Coley as a player and student, and the availability of NIL compensation to Coley through 1PACK, NCSU's NIL collective. These declarations, however, say nothing about a substantial anticompetitive effect on the labor market as a whole. Likewise, Coley's declaration and the "indirect" evidence of his collegiate football career support the conclusion that the Challenged Bylaws impacted Coley's ability to earn additional NIL compensation, but fall short of supporting Coley's conclusion that the Challenged Bylaws have a substantial anticompetitive effect on the market as whole.

McDonald claims that he also exhausted his eligibility and that he would like to play a fifth season. See [D.E. 9-5] ¶¶ 2–5. McDonald's declaration, however, contains no evidence of a larger market impact. Furthermore, even taking McDonald and Coley's collegiate careers together, the anecdotal experiences of two Division I college football players do not show that the Challenged

Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. See, e.g., Am. Express Co., 585 U.S. at 542 (observing that evidence of anticompetitive effects would include evidence of "reduced output, increased prices, or decreased quality in the relevant market"); Brantmeier, 2024 WL 4433307, at *5 (refusing to enjoin eligibility rules governing acceptance of prize money in non-NCAA competitions after finding evidence of harm to competition "remarkably thin" and based only on harm to only a "few" individuals); Rock v. Nat'l Collegiate Athletic Ass'n, 928 F. Supp. 2d 1010, 1023–24 (S.D. Ind. 2013) (finding that plaintiffs "failed to adequately allege anticompetitive effects in their market" from challenged rules capping the length and number of scholarships because plaintiffs "fail[ed] to explain how eliminating either [rule] would lead to the creation of more scholarships"). Moreover, the court credits Dr. Murry's declaration and finds that the current record does not support Coley's argument that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players. See [D.E. 17-2] ¶¶ 13–16.

Coley's argument that the Challenged Bylaws have a substantial anticompetitive effect on the labor market for Division I college football players rests on personal anecdotes. Coley fails to satisfy his initial burden under the rule of reason analysis and, therefore, fails to make a clear showing that he is likely to succeed on the merits of his claim under the Sherman Act. Thus, the court denies Coley's motion for an extraordinary, mandatory preliminary injunction.

C.

Alternatively, even if the court considered Dr. Maxcy's declaration and the ESPN article and found that Coley had established a likelihood of success on the merits, the court would still deny Coley's request for an extraordinary, mandatory preliminary injunction because the balance

of hardships does not favor Coley. Granting Coley's request would upend the NCAA's Division I Bylaws and affect "over 180,000" Division I student-athletes in "multiple sports." [D.E. 17] 25. Even if the court granted Coley the relief he requests, nothing guarantees that Coley will get the additional playing time and NIL money he seeks. As Coley knows from his own experience, personal circumstances, unforeseen injuries, and team needs affect playing time. Moreover, Coley has offered little evidence beyond his own experience to support his request for an extraordinary, mandatory preliminary injunction. On this limited record, Coley fails to meet the high bar required to upend the status quo with the entry of an extraordinary, mandatory preliminary injunction. Thus, the court denies Coley's motion for an extraordinary, mandatory preliminary injunction.

III.

In sum, the court DENIES plaintiff's request for a preliminary injunction [D.E. 8] and GRANTS defendant's motion to disregard portions of Coley's reply [D.E. 19].

SO ORDERED. This _6_ day of June, 2025.

JAMES C. DEVER III<br>
United States District Judge

21