**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Case No. 5:25-cv-00098-D-BM**

| | | |
|---|---|---|
| COREY COLEY, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT NATIONAL |
| v. | ) | COLLEGIATE ATHLETIC |
| | ) | ASSOCIATION'S ANSWER |
| NATIONAL COLLEGIATE ATHLETIC | ) | AND AFFIRMATIVE |
| COMPLAINT FOR | ) | DEFENSES TO COMPLAINT |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

NOW COMES the National Collegiate Athletics Association ("NCAA" or

"Defendant"), by and through its attorneys, Holland & Knight LLP, and for its

answer to Plaintiff Complaints for Injunctive Relief, state as follows:

## PARTIES AND FACTUAL BACKGROUND

1.     Plaintiff Corey Coley, Jr. ("Coley") brings this action to challenge the
Bylaws 12.8, *et seq.,* 12.02.06 ("Intercollegiate Competition Rules"), 12.8.3.1 and
12.8.3.1.7 ("Minimum Amount of Competition, as applied to football"), (collectively
referred to as the "Challenged Rules) of Defendant, National Collegiate Athletic
Association ("NCAA"), as currently specified in the 2024-25 NCAA Division I
Manual (herein "NCAA Bylaws" or "Bylaws") attached hereto as "Exhibit 1." This
NCAA Bylaw provision prohibits a "student-athlete" from engaging in "more than
four seasons of intercollegiate competition in any one sport" and currently prohibits
an "institution" from permitting a "student-athlete to represent it in intercollegiate
competition" outside of the "time periods" specified in the Challenged Rules. The
NCAA arbitrarily determines what constitutes a "season," (which the NCAA defines
for football as appearing in more than four (4 ) games) without regard to whether an
injury prevented a "student-athlete" from *completing* an *entire* season (which in
Division I football is twelve (12) regular season games, and as many as seventeen
(17) games for teams that compete in the College Football Championship). The
NCAA applies the Challenged Rules without regard to whether a college athlete,
after "four seasons of intercollegiate competition," is still enrolled in school,
pursuing a degree; without regard to whether a "student-athlete" has missed more
than the equivalent of what the NCAA defines as a "season of competition" during

their career due to injury; without regard to those provisions of the NCAA Bylaws that knowingly permit (with or without a "waiver") certain student-athletes to continue to participate in athletics longer than just "four seasons of competition"; without regard to the market realities that there is demand for the services of "student-athletes", like Coley, beyond "four seasons of competition" while they are enrolled in school; and without regard to the reality that the NCAA fully knows that the Challenged Rules unjustifiably restrains the ability of college athletes to continue to earn substantial sums ("NIL Compensation") through use of their name, image and likeness ("NIL") connected to the valuable services that college athletes, like Coley, provide as a Division I football player beyond four seasons of intercollegiate competition. This action seeks injunctive relief against the NCAA for violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

**ANSWER**: Denied.

## INTRODUCTION

2.      In 2021, a unanimous United States Supreme Court in *NCAA v. Alston,* 504 U.S. 69 (2021) changed the landscape of college athletics forever, and provided the foundation for college athletes, like Coley, to receive compensation for use of their names, images and likenesses ("NIL Compensation"), with the Supreme Court applying anti-trust ("rule of reason") scrutiny to certain NCAA rules, and finding that the "anti-competitive" nature of the rules at issue in *Alston* violated Section 1 of the Sherman Act.

**ANSWER**: Admitted that the *Alston* case was unanimously decided in 2021.

Except as expressly admitted herein, the remaining allegations in Paragraph 2 are

denied.

3.      The term "student-athlete," as used by the NCAA in its Bylaws, perpetuates a myth – especially as it pertains to Division I college football – namely, the "nobility of amateurism," which at least one Federal Circuit Court stated "obfuscate the nature of the legal relationship at the heart of a growing commercial enterprise. Context makes this vividly apparent." *Johnson v. Nat'l Collegiate Athletic Ass'n,* 108 F.4th 163, 171 (3d Cir. 2024). Irrespective of the NCAA's Bylaws that, after *Alston,* were amended so as to permit those whom the NCAA designates as "student-athletes" to earn millions in NIL Compensation, no longer is the NCAA entitled to any sort of "immunity" from any of its other rules, like the Challenged Rules, that restrain trade, are anticompetitive, and for which there exists no procompetitive justification, and therefore, violate the Sherman Act.

**ANSWER**: Denied.

4.     Reacting not only to *Alston*, but State legislation (including in North Carolina) that made it lawful for college athletes to receive NIL Compensation, in July 2021, the NCAA rescinded its prohibition against college athletes receiving NIL Compensation. As a result, the NIL opportunities available to college football athletes[1] exploded, with sources estimating the 2024 college football NIL market at $1.1 billion. More than 99% of NIL Compensation is paid to Division I athletes, like Coley.

**ANSWER**: Denied.

5.     Outside of the current NIL Compensation opportunities available to Division I college football players, like Coley, without playing professionally (a statistical improbability for most college football players), athletes who are playing Division I college football have no meaningful opportunity to profit off of their NIL outside of their college football playing days under the shadow of the monopoly that is the NCAA. The NCAA's Bylaws limit Division I football players like Coley to "four seasons of competition," but define a "season" for purposes of determining whether a "season" of eligibility has been exhausted as having participating in more than four (4) games.[2]

**ANSWER**: Denied.

6.     Yet the NCAA Bylaws permit Division I FBS college football teams to play as many as seventeen (17) games during a season (twelve (12) regular season games; conference championship game; and the College Football Playoffs) (CFP – as many as four (4) games), and permit Division I football players ("Redshirts") who do not play in more than four (4) regular season games to participate in all post-season competition (conference championship games, bowl games, and the CFP) without exhausting a "season" of eligibility. The NCAA Bylaws permit certain Division I college football players to play more than 4 "seasons" by taking advantage of the NCAA's "Covid Waiver," that grants an additional year of eligibility and pretends that the 2020-21 college football season never happened (without regard to whether college football players like former Auburn/Oregon quarterback Bo Nix, who played five (5) seasons of college football actually played a season of college football in 2020-21). The NCAA Bylaws permit Division I college football players who suffer a season-ending injury prior to the completion of an arbitrary 30% of the regular season to receive the benefit of a "waiver" and an additional (5th) season of competition, yet those same Bylaw provisions do not permit Division I college football players like Coley (who has missed a total of nine (9) games during his college football career due to injury and who suffered a season-ending injury on the

---

[1] See Ex. 2, "NIL at 3: The Annual Opendorse Report" at p. 4.

[2] The four-game definition is applicable to Division 1 football pursuant to NCAA Bylaw 12.8.3.1.6. NCAA Bylaw 12.8.3.1 defines a season of competition to be as little as any appearance in any competition, this rule is then heavily modified by NCAA Bylaws 12.8.3.1.1-7.

fifth defensive snap of the sixth game of North Carolina State University's thirteen (13) game season) who are still enrolled in college in pursuit of a degree the benefit of any such waiver and therefore the opportunity to earn substantial NIL Compensation during a fifth season of competition for which there exists a demand for their services.

**ANSWER**: Denied.

7. The Challenged Rules do not promote competition – they unjustifiably restrain competition. Similarly, the Challenged Rules fail to benefit college athletes, like Coley, who are enrolled or wish to be enrolled in college and whose services as a college football player in the relevant market are in demand, and from which they earn substantial NIL Compensation. 8. As with Coley, the Challenged Rules stifle competition in the relevant labor market (NCAA Division I college football players), as NCAA member institutions are currently not permitted to allow Coley, or anyone else who has competed in what the NCAA arbitrarily defines as a football season for four (4) years, to continue to play football because, under the Challenged Rules, college football players like Coley are not "eligible" to continue to play football. But for the Challenged Rules, there would be a market for Coley's services as a Division I college football player, and Coley would have an opportunity to continue his education and while doing so, play football, from which he can earn substantial sums.

**ANSWER**: Denied.

8. As with Coley, the Challenged Rules stifle competition in the relevant labor market (NCAA Division I college football players), as NCAA member institutions are currently not permitted to allow Coley, or anyone else who has competed in what the NCAA arbitrarily defines as a football season for four (4) years, to continue to play football because, under the Challenged Rules, college football players like Coley are not "eligible" to continue to play football. But for the Challenged Rules, there would be a market for Coley's services as a Division I college football player, and Coley would have an opportunity to continue his education and while doing so, play football, from which he can earn substantial sums.

**ANSWER**: Denied.

9. The Challenged Rules as applied by the NCAA harm college athletes like Coley who are still enrolled in college and are contrary to NCAA's admissions in its Manual that "intercollegiate athletics programs provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience." (Ex. 1, Preamble).

**ANSWER**: Denied.

4

10.     Coley, and other Division I football players who have competed in what the NCAA arbitrarily defines as "four (4) seasons of competition," are harmed by this illegal restraint because they are being prevented by these Rules from taking advantage of the demand for their playing skills from NCAA member institutions and the associated ability to earn substantial NIL Compensation while doing so, all while continuing their educational experience, the combination of which the NCAA has conceded is a "vital, co-curricular" part of Coley's educational experience.

**ANSWER**: Denied.

11.     Unless the NCAA is enjoined from enforcing these unjustified anticompetitive rules against its member institutions, who would otherwise permit Coley, and other Division I football players who have competed in what the NCAA arbitrarily defines as a "season" for four (4) years, to continue to play football for a fifth season and earn substantial NIL Compensation, Coley's freedom to continue to pursue his education, while playing college football from which he can earn substantial NIL Compensation, will be permanently closed, solely and as a direct result of these rules. The harm therefore inflicted by these Rules is irreparable and ongoing, necessitating the issuance of temporary, preliminary, and permanent injunctive relief.

**ANSWER**: Denied.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under Section I of the Sherman Act, 15 U.S.C. §1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. §26 and 28 U.S.C. §1331 and 1337.

**ANSWER**: Admitted.

13.     This Court may exercise personal jurisdiction over Defendant NCAA because it currently transacts business within the Western Division of the Eastern District of North Carolina. The NCAA and its member institutions, including NCSU, where Corey is a Division I football player and student, conduct athletic competitions, ticket and merchandise sales, television agreements and other revenue-generating activities in the Eastern District of North Carolina.

**ANSWER**: Admitted that this Court may exercise personal jurisdiction over

Defendant NCAA. Except as expressly admitted herein, the allegations in

Paragraph 13 of the Complaint are denied.

14.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22, and under 28 U.S.C. §1391(b)(2).

**ANSWER**: Admitted.

## PARTIES

15.     Plaintiff Corey Coley ("Coley") is a student and college football player at NCSU in Raleigh, North Carolina, a Division I member of the NCAA, and currently resides in Wake County, North Carolina.

**ANSWER**: The NCAA admits that the allegations in Paragraph 15 were true for the 2024-2025 NCAA football season. Except as expressly admitted herein, the allegations in Paragraph 15 are denied.

16.     The NCAA is, upon information and belief, an unincorporated association that is currently the governing body for college sports in the United States. The NCAA's membership includes more than 1,000 colleges and universities located throughout the United States, including in the Eastern District of North Carolina, organized into three (3) divisions (Division I, II and III), with Division I comprised of over 350 colleges and universities.

**ANSWER**: Admitted.

17.     The NCAA's member institutions (including NCSU) have each been required to adopt, and have adopted, the NCAA's Constitution and Bylaws contained in the Manual, including Section 12.8 and its subparts, entitled "Seasons of Competition: Five Year Rule." The NCAA's Constitution and Bylaws constitute horizonal agreements between the NCAA and its member institutions and among NCAA member institutions, including (but not limited to) NCSU.

**ANSWER**: Admitted, except Defendant NCAA expressly denies that the term "horizontal agreement" applies in the context alleged, and denies that the term in and of itself is an element of any actionable claim against Defendant NCAA in this case. .

18.     In order to maintain membership in the NCAA, member institutions, including NCSU, must abide by the rules and regulations contained in the Manual, including the Challenged Rules, as failure to do so subjects member institutions, including NCSU, to disciplinary action from the NCAA.

6

**ANSWER**: Admitted.

19.     As of 2025, the NCAA's members "collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition. Nat'l Collegiate Athletic Ass'n v. Alston, 594 U.S. 69, 90, 141 S. Ct. 2141, 2156, 210 L. Ed. 2d 314 (2021). Therefore, individuals, like Coley, whose services as a college athlete are indeed marketable and who wish to continue to participate in college athletics from which they can earn substantial NIL Compensation (all while pursuing their college degree) must, by necessity, attend an NCAA Division I member institution. There are simply no other alternatives that offer the types of NIL Compensation opportunities available at NCAA Division I colleges and universities, under which Coley, and others, can receive a high quality education; be coached and trained by some of the most qualified individuals in the United States; top of the line training facilities; exposure to representatives from professional sports organizations; be the subject of focused publicity and attention, including national television broadcasts; compete at the highest level; and take advantage of the opportunity to earn substantial NIL Compensation.

**ANSWER**: Denied.

### FACTS

### Member Institutions are Governed by the NCAA

20.     Founded in 1905 to regulate college football, the NCAA and its member institutions have adopted, and therefore, enforce, the regulations contained within its Constitution and Bylaws.

**ANSWER**: Admitted.

21.     Those within Division I are divided, for football, into two (2) subdivisions, the FBS and FCS.

**ANSWER**: Admitted.

22.     There are more than forty (40) separate Division I conferences within the NCAA (that include football, non-football and other sport specific conferences) each of which are entitled to enact and to thereafter enforce certain rules specific to those conferences so long as they are otherwise consistent with the NCAA's Rules, and each Division I member institution must specifically agree to enforce the NCAA's rules, including the Challenged Rules.

**ANSWER**: Admitted.

23.     While the NCAA started as a relatively small organization, today it "has become a sprawling enterprise." *Alston*, 594 U.S. at 79. The NCAA generates

more than $1 billion in revenues each year, and the NCAA's largest conferences each separately generate hundreds of millions of dollars in revenues each year.

**ANSWER**: Admitted that NCAA is a larger organization than it was in the early 1900s. Except as expressly admitted herein, the remaining allegations and their implications in Paragraph 23 are denied.

24. The NCAA's Manual makes clear that it believes participation in college athletics is a "vital" and "integral" part of the "educational experience."

**ANSWER**: Admitted.

### The Challenged Rules including the "5 Year Rule"

25. Pursuant to the provisions of NCAA Bylaw 12.8, *et. seq.* "[a] student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport," and an institution, including NCSU, "shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports" within "five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for…a full-time program of studies in a collegiate institution…."

**ANSWER**: Admitted.

26. While the NCAA's Bylaws contain various "exceptions" to the 5 Year Rule, as written, none of those exceptions have been construed by the NCAA so as to permit an athlete like Coley to participate in football at NCSU beyond four (4) seasons, as defined by the NCAA.

**ANSWER**: Denied as alleged.

27. While the NCAA's Bylaws do provide a circumstance in which Coley can request a "waiver" of the 5 Year Rule, NCSU and Coley have applied for such a waiver and as of February 6, 2025, that waiver request was denied by the NCAA.

**ANSWER**: Admitted that the waiver request submitted by NCSU was denied. Except as expressly admitted herein, the remaining allegations in Paragraph 27 are denied.

#523250394_v1

28.     The NCAA's Bylaws (12.8.3) contain the "Criteria for Determining Season of Competition," and provide that "[a]ny competition, regardless of time, during a season in an intercollegiate sport shall be counted as a season of competition in that sport…", subject to certain exceptions, including as, it pertains to football, an exception that provides that "a student-athlete may compete in up to four contests in a season without using a season of competition." Bylaw 12.8.3.1.6 (the "Redshirt Rule"). However, the NCAA created exceptions to its Redshirt Rule for football players by expanding the number of games that a "Redshirt" can play beyond four contests, as any postseason games are excluded in the application of the Redshirt Rule, and therefore, the beneficiaries of the Redshirt Rule can participate in up to nine (9) games in a season without exhausting a season of eligibility.

**ANSWER**: Denied.  Defendant further states that the referenced rules speak

for themselves as to their writings.

29.     During his college football career, Coley has missed nine (9) games, or more than two (2) "seasons," as defined by the NCAA (more than four contests) due to injury, as he missed two (2) games due to injury during his sophomore season at the University of Maryland, and seven (7) games due to injury during the 2024-25 season while at NCSU.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 29 and therefore denies them.

30.     NCAA Bylaw (12.8.4) provides for a "Hardship Waiver" under which "[a] student-athlete may be granted an additional year of competition by the conference or the Committee on Student-Athlete Reinstatement for reasons of 'hardship.'" Hardship is defined as an "incapacity resulting from an injury or illness that has occurred under *all* of the following conditions" including "prior to the first contest or date of competition of the second half of the playing season that concludes with the NCAA championship in that sport and results in incapacity to complete for the remainder of that playing season" and "when the student-athlete has not participated in more than three contests or dates of competition or 30 percent of the maximum number of contests or dates of competition of the playing season that concludes with the NCAA championship."

**ANSWER**:  Denied.  Defendant further states that the referenced rules speak

for themselves as to their writings.

31.     Those provisions of the Challenged Rules that limit Coley to "four (4) seasons of competition" (defined as more than 4 games regardless of the number of snaps that he played and regardless of the total games that Coley missed because of

injury), restricting any "hardship" waivers only to those football players who have participated in less than "30 percent of the maximum number of contests or dates of competition," while allowing "hardship" waivers to players who played only 2 games or 1 game and 5 defensive snaps less than Coley played in the 2024-25 football season are anti-competitive for which there exists no procompetitive justification. There is no less a market for Coley's services for a 5th season than those college football players who have achieved the benefit of a Redshirt year; a Covid Waiver; a Hardship Waiver; or any other exception.

**ANSWER**: Denied.

### Application of 5 Year Rule to Coley

32.     Coley is from Jacksonville, Florida, where he played for Trinity High School, a small private school with less than 1,200 students. Coley was heavily recruited coming out of high school, and eventually committed to attend and play Division I football at the University of Maryland, located the farthest away from home that Coley had ever been in his life.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 32 and therefore denies them.

33.     While Coley expected to Redshirt his true freshman year in 2021, because of injuries, Coley's team needed him to play, and he therefore appeared in nine (9) games, playing a total of 230 snaps on defense as a cornerback, and also playing on special teams. Given the demands of his academic pursuits, in addition to being a football player, Coley felt completely unprepared to deal with the struggles of being far away from home, and accordingly, his mental health struggled. Like many athletes, Coley was hesitant to reach out for help.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 33 and therefore denies them.

34.     Two (2) weeks before the start of Coley's sophomore (2022) football season, he suffered a knee injury during training camp, which kept him from competing in the first two (2) games of the season. The recovery process from this injury was grueling, and even after Coley returned to football, he was in constant pain and discomfort, which caused him to feel overwhelmed, at times, by the physical and mental challenges that he faced, which affected his confidence and performance both on and off the field. Coley's mental health declined to the point where he felt like he was barely holding things together, but working with a sports

psychologist, Coley was able to develop strategies to cope with the pain and pressure. Coley's 2022 sophomore season at the University of Maryland was one of the toughest years of his life, during which he appeared in ten (10) games and a total of 291 snaps at cornerback.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and therefore denies them.

35.    Coley's junior year at the University of Maryland (2023) was a year of personal loss and tragedy, as he endured the loss of his uncle from pancreatic cancer, someone who had played a vital role in Coley's life. Being far away from home made Coley's grief from this death almost unbearable, and left him feeling isolated, helpless, distracted and unmotivated, which again, affected his performance both on and off the field. During the 2023 season, Coley appeared in ten (10) games and a total of 305 snaps at cornerback, while also playing on special teams. By way of perspective, one of Coley's Maryland teammates and fellow cornerback, Deonte Banks, chosen in the 1st round of the 2023 NFL draft, played more than 600 snaps during his final season at Maryland.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and therefore denies them.

36.    After Coley's junior year at the University of Maryland, he decided to enter the transfer portal and ultimately transferred to NCSU in order to be closer to his mother and to play his senior year (2024) at NCSU. However, as a single-mother, Coley's mother had to work multiple jobs to make ends meet and simply was not able to get to NCSU to see Coley, which left Coley feeling unfocused and emotionally drained.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 and therefore denies them.

37.    Prior to enrolling at NCSU, Coley had not received any NIL Compensation while he was at the University of Maryland, but did receive NIL Compensation in 2024 from 1PACK, NCSU's collective that "connects fans, alumni, businesses and charities" with athletes at NCSU, including Coley. Coley has pursued a college degree not only to play college football but also connect with individuals who can and will have a lifelong impact on him, beyond sports.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and therefore denies them.

38. Coley began the 2024 season in a lower place, mentally, than he had ever been, and he had no readily available family support system to help him. It was not until the start of NCSU's 2024 football season that he reached out to professionals at NCSU for help. Because of injuries in the defensive backfield, the NCSU football team needed Coley on the field, and despite dealing with a nagging ankle injury, Coley pushed through, mentally and physically, not wanting to let his teammates down. Despite the lingering ankle injury, Coley did his best to manage both the needs of the team and his own needs, which ultimately caused Coley's anxiety and mood symptoms to become exacerbated during this period.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and therefore denies them.

39. On the fifth defensive snap of NCSU's sixth game of the 2024 football season against Wake Forest, Coley suffered a season-ending injury, which caused Coley to miss the remainder of that game and NCSU's remaining seven (7) games, including six (6) regular season games against Syracuse, California, Stanford, Duke, Georgia Tech and UNC, and NCSU's bowl game against East Carolina, all of which were televised. Coley appeared in five (5) games and five (5) more defensive snaps in NCSU's sixth game, and played a total of 213 snaps at cornerback, while also playing on special teams.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore denies them.

40. According to the NCAA, under its Rules and stated criteria for a "Hardship Waiver," had Coley's injury occurred in NCSU's fourth (4) game, the 2024 season would not have counted as a season of competition or Corey would have been eligible for a "Hardship Waiver." Furthermore, had Coley played in twenty-four (24) fewer snaps (18 total snaps in the 5th game and 6 in the 6th game), Coley's 2024-25 "season" would not have constituted a "season of competition." To further amplify the arbitrary nature of what constitutes a "season" under the NCAA's rules, the number of games Coley missed due to injury (nine (9)) would be the equivalent of two (2) seasons, yet the total games missed due to an injury is not one of the stated criteria for a "Hardship Waiver" or any other exception.

**ANSWER**: Denied.

41.  Coley is a great student, with a cumulative 3.5 GPA, and is on track to complete his degree by the end of 2025.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 41 and therefore denies them.

42.  But for the Challenged Rules, NCSU wants Coley to return to NCSU and play football during the 2025-26 college football season, and Coley wants to return to NCSU where he not only has the opportunity to play football and earn additional NIL Compensation through NCSU's collective, 1PACK, but also continue his academic endeavors. However, NCSU's position is not unique, as other than NCSU, there is a demand for Coley's services as a Division I college football player other than through NCSU.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 42 and therefore denies them.

43.  NCSU applied to the NCAA, beginning in December 2024, to grant Coley an additional year of eligibility. Pursuant to Coley's waiver application (attached hereto as "Exhibit 3" and incorporated by reference) NCSU represented that Coley has endured hardships in every year of his collegiate enrollment. NCSU informed the NCAA that during Coley's freshman year at Maryland, due to injuries on the team, he had to play and participated in nine (9) contests and was unable to redshirt to develop physically and mentally; that during his sophomore year, he participated in ten (10) contests, however, he sustained an injury (torn meniscus) that kept him out of the first two (2) games of the year and plagued him throughout the season; that in his junior year, he dealt with his uncle having pancreatic cancer, and the combined mental and physical challenges effected his performance both on and off the field; and that during the 2024 season at NCSU, he suffered an ankle injury in his fourth game in which he continued to play on and then a season-ending injury to his knee in his sixth game that kept him out for the remainder of the fall 2024 season, as confirmed by NCSU's head trainer.

**ANSWER**: Defendant admits that the information recited in Paragraph 43

was disclosed to it in NCSU's waiver request, but lacks independent knowledge or

information sufficient to form a belief as to the truth of the allegations  and

therefore denies them.

44.  With respect to the mitigating factors, NCSU provided to the NCAA that Coley's collective struggles, both mentally and physically, throughout his

13

collegiate career should be considered by the NCAA. NCSU set forth that while Coley competed in 2024 beyond 30% of NCSU's competitions and beyond the mid-way point in that and other seasons, Coley's circumstances outside of his control negatively impacted his overall athletic participation to the point he was unable to have a meaningful and impactful opportunity in college athletics. He dealt with multiple injuries, a family member having pancreatic cancer and passing away, and mental health struggles throughout his four (4) years of collegiate enrollment. NCSU provided a personal statement from Coley that outlined all of this.

**ANSWER**: Defendant admits that the information recited in Paragraph 44 was disclosed to it in NCSU's waiver request, but lacks independent knowledge or information sufficient to form a belief as to the truth of the allegations and therefore denies them.

45.   Based on all of these circumstances, NCSU requested Coley be granted a fifth season of competition, which would still meet the five (5) year period of eligibility.

**ANSWER**: Admitted that this relief was requested. Except as expressly admitted herein, the remaining allegations in Paragraph 45 are denied.

46.   With the waiver request submitted by NCSU, NCSU provided the NCAA confirmation from a sports psychologist at NCSU that detailed her treatment of Coley after his ankle injury, and her meetings with Coley reflected themes of Coley trying to best manage the needs of the team while advocating for his own needs, which impacted Coley's anxiety and mood symptoms, which became exacerbated.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and therefore denies them. Defendant further states that the waiver request speaks for itself as to its writing.

47.   With the waiver request submitted by NCSU, NCSU provided the NCAA with confirmation from NCSU's head trainer that Coley was not "medically cleared" for all games in 2024; that Coley injured his knee on October 5, 2024, against Wake Forest and "was not able to make it back for the rest of the season. He was not cleared for the games against Syracuse, California, Stanford, Duke, Georgia Tech, UNC and East Carolina."

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 47 and therefore denies them.

Defendant further states that the waiver request speaks for itself as to its writing.


48.     Despite this, NCSU's waiver application was summarily denied by the NCAA on February 6, 2025. (Attached hereto as "Exhibit 4"). In its denial, the NCAA stated that the "requirements" to obtain a waiver "are not satisfied given [Coley's] participation exceeded the 30% legislated limit by two contests." In its denial, the NCAA falsely stated that NCSU's head football athletic trainer stated that Coley "was cleared for competition after his knee injury October 5, 2024." That stated reason was false; after his injury of October 5, 2024, Coley was never "medically cleared" to resume any type of competition. In apparent recognition of the false information contained in its original denial, on February 18, 2025, the NCAA submitted an amended denial, but this time stating that after his injury of October 5, 2024, Coley was not medically cleared to resume any type of competition. (Attached hereto as "Exhibit 5.")

**ANSWER**: Defendant admits that the waiver request was denied. Except as

expressly admitted herein, the remaining allegations in Paragraph 48 are denied. .

49. The NCAA's waiver criteria, "designed to provide a student-athlete with the opportunity to participate in four seasons of intercollegiate competition within a five year period," includes that an athlete "did not use a season of intercollegiate competition due to an institutional decision to red-shirt the student-athlete," or was "deprived of the opportunity to participate for more than one season in his or her sport within the five-year period of eligibility for reasons that are beyond the control of the student-athlete or the institution." Bylaw 12.8.1.7.

**ANSWER**: Admitted.  Defendant further states that the By-laws speak for

themselves as to their writings .

50.     Coley's "window of opportunity" to continue to play football at NCSU from which he can earn substantial NIL Compensation is closing, as NCSU is in need of filling vacancies in their defensive backfield left from the departure/transfer of some of Coley's 2024 teammates; Spring practice for the 2025 football season begins at the end of February, 2025, and if Coley is not eligible to participate under the NCAA's Bylaws, Coley has been informed that NCSU will be forced to move on,

thereby depriving Coley of an opportunity not only to play football but to earn substantial NIL Compensation. In addition, if Coley is not eligible to play a fifth season of college football in 2025, the only other way that Coley can continue to play football is to attempt to get a job playing professional football, with the NFL draft scheduled for April 2025.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and therefore denies them.

51.     Coley's situation stands in stark contrast to athletes who get five (5) seasons of eligibility to play football because of the NCAA's "Redshirt Rule" and "Covid Waiver" policy, under which any student enrolled at an NCAA Division I school received a one-year eligibility extension, and the 2020 season did not count as a season of competition, giving these students six (6) years to play five (5) seasons. An example of that is Bo Nix, who started at Auburn University at quarterback for three (3) seasons, before transferring to the University of Oregon where he started for two (2) additional seasons, before being selected in the first round of the 2024 NFL draft.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and therefore denies them.

52.     Coley's situation stands in stark contrast to students who graduate from high school and become a professional athlete in some sport other than football, who can (after playing professional sports) enroll in college and be eligible to play college football and today receive NIL Compensation in that sport.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and therefore denies them.

53.     Coley's situation stands in stark contrast to football players who are injured earlier than the fourth game of the season, who are entitled to consideration of a "Hardship Waiver" and an additional season of competition.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and therefore denies them.

54.     Therefore, the Challenged Rules cannot be justified as designed to achieve any sort of competitive balance, or older athletes (like Chris Weinke, a Heisman trophy winning quarterback who played professional baseball before

enrolling as a freshman at Florida State) would be precluded from participating in college sports. However, no "age restriction" exists.

**ANSWER**: Denied.

55. The NCAA's "Covid Waiver" (Exhibit 6) amplifies the anti-competitive nature of the 5 Year Rule, which allows some students who actually played during the 2019-20 football season to compete for more than four (4) years. The NCAA's "Covid Waiver" applies regardless of whether a student actually participated in a "season" (as defined by the NCAA).

**ANSWER**: Denied.

56. In its ever-revolving rules, the NCAA has now even granted a "temporary waiver" to permit athletes who attended and competed at a "non-NCAA" school for one or more years to remain eligible and compete in 2025-26 if those athletes would have otherwise used their final season of competition during the 2024-25 academic year.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 56 and therefore denies them.

57. The Challenged Rules violate the Sherman Act, by wrongfully and arbitrarily defining a season of competition as one in which an athlete has appeared in any contest, unless the athlete appears in less than an arbitrarily designated four (4) games. Even though NCSU participated in twelve (12) games, and the eventual 2024-25 national champion, Ohio State, participated in a total of sixteen (16) games, the Challenged Rules wrongfully equate participation in more than four (4) games as participating in an entire football season, thereby denying Coley and other athletes the opportunity to earn NIL Compensation for an additional fifth season while continuing to pursue their college degree.

**ANSWER**: Denied.

58. Whatever the alleged justifications for the Challenged Rules, the NCAA has already identified a less restrictive alternative to fix the anticompetitive problems inherent in the 5 Year Rule by allowing all athletes five years to play five seasons.[3] Such a rule change would make Coley eligible to play football for NCSU in 2025. However, when or if the NCAA intends to implement such a rule change is

---

[3] https://www.si.com/college/purdue/other-sports/report-ncaa-considering-five-year-eligibility-rule-for-all-student-athletes-college-sports

#523250394_v1

unknown and would likely come too late for Coley to take advantage of the opportunities at NCSU, where Coley is currently enrolled as a student.

**ANSWER**: Denied.

59. Any goals of the challenged Rules can be accomplished through less restrictive alternatives, as the NCAA's Rules already require that, while engaged in athletics, student-athletes must maintain progress towards a degree, and maintain minimum credit hours and grade point averages. These Rules accomplish the NCAA's goals without the unjustified restraints imposed by the Challenged Rules.

**ANSWER**: Denied.

### NCAA's Rule of Restitution

60. NCAA Bylaw 12.11.4.2 (the "Rule of Restitution") currently provides:

If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete, or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed, or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions....

Potential punishments include postseason bans, return of television revenue, vacating wins and other financial penalties. No preliminary injunction would be effective if the NCAA would be permitted to apply the Rule of Restitution against Coley and NCSU or any other Division I college where Coley may transfer. The purpose of the Rule of Restitution is clearly to "punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 601 (N.D.W. Va. 2023). "The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure designed to inhibit a person's access to the courts. Knowing this, many Division I institutions will not permit the student-athlete to compete, even if a court issues a temporary retraining order or a preliminary injunction finding that those rules are likely illegal. This, in turn, deters student-athletes from challenging the NCAA's substantive eligibility rules...." *Id.*

18

**ANSWER**: Denied. Defendant further states that the references rules speak for themselves as to their writings.

## Relevant Markets

61.     The Challenged Rules affect the market for Division I football players. In that market, college football players like Coley compete with each other for a place on the team and for playing time, and in turn, Division I members compete against each other in order to find and sign the best football players for their teams.

**ANSWER**: Denied.

62.     The relevant geographic market is the United States, as the reach of the NCAA and its member institutions is nationwide, and they engage in competition in the relevant labor markets across the United States.

**ANSWER**: Denied.

63.     Other than participating in NCAA Division I football, Coley has no alternatives to the NIL Compensation and benefits that he would receive from participating as a member of NCSU's or another Division I college football team. This labor market is unique because the opportunity to showcase athletic skills at the highest level, while enrolled in college and pursuing a degree is unique. The NCAA and its member institutions control the NCAA Division I football market and currently has the exclusive right to adopt and enforce rules regarding participation in Division I athletics, including football. Undoubtedly, the relationship between the NCAA and its member institutions (including NCSU) and the transactions in which they engage with athletes are commercial in nature and have a significant impact on what college athletes may earn in the future. Because of the immense public interest in college football, college athletes, including Coley, produce significant revenues for the NCAA's member institutions. With more than 99% of NIL Compensation being paid to NCAA Division I athletes, NIL Compensation is practically available only to NCAA Division I athletes. Prior to transferring to NCSU, Coley had no opportunity to earn, and did not earn, any NIL Compensation.

**ANSWER**: Denied.

## Anti-competitive effects

64.     The NCAA claims that its rules promote the well-being of college athletes and preserve the amateurism aspect of Division I college sports. However, as the Supreme Court held in *Alston*, the NCAA cannot define the nature of amateurism that it may claim exists, and the Supreme Court itself "struggled to ascertain for itself 'any coherent definition' of the term." *Alston*, 594 U.S. at 83.

**ANSWER**: Denied.

65.    The relevant market is college athletics generally and college football specifically. The Challenged Rules are the equivalent of horizontal agreements between the NCAA and its member institutions who compete for the services of NCAA Division I football players and then against one another.

**ANSWER**: Denied.

66.    The Challenged Rules restrain Coley and other college athletes from enhancing their lives and economic well-being from NIL Compensation and the continued college experience, a benefit afforded to certain Division I athletes who have taken advantage of the NCAA's Redshirt, "Covid Waiver" and other related exceptions or waivers, and have played or will play five seasons of college football, an opportunity that is not currently available under the Challenged Rules to Coley.

**ANSWER**: Denied.

67.    There can be no dispute that the NCAA itself has the power in not only establishing eligibility rules, but also arbitrarily promulgating exceptions to those same rules such as the exceptions identified above and other "Circumstances Beyond the Control" of the athletes.

**ANSWER**: Denied.

68.    The Challenged Rules violate the Sherman Act because its anticompetitive effects harm college football players like Coley and those that consume college football through the myriad of media outlets that are available to watch college football.

**ANSWER**: Denied..

69.    Given the drastic changes in the competitive landscape, higher profile college football players, like Coley, are able to earn a rapidly growing part of the NIL Compensation that is now available to college football players.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and therefore denies them.

70.    Accordingly, an athlete, like Coley, who is allowed a fifth season of competition could earn, and with respect to Coley will earn, substantial NIL Compensation.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and therefore denies them.

20

71.    As a result, the NCAA's eligibility rules depress competition for roster spots, and in turn NIL Compensation, by excluding athletes, like Coley, after what NCAA has deemed "four seasons of competition" when in fact, their marketability for their services as college football players and therefore NIL income is at its highest point.

**ANSWER**: Denied.

72.    The Challenged Rules are nothing more than an agreement among the NCAA's member institutions to limit the amount of time that athletes, like Coley, can play college football, because they have suffered injuries that have prohibited them from participating in a complete season of college football or are otherwise not able to take advantage of the various arbitrary exceptions or waivers created by the NCAA, including but not limited to, NCAA's Redshirt Rules and "Covid Waiver."

**ANSWER**: Denied.

73.    The Challenged Rules harm athletes like Coley in the relevant markets in a number of ways and at a number of times during their college football careers including, but not limited to the following: (a) when an athlete decides where to attend college; (b) when that same athlete decides how many games he/she may participate in; (c) when an athlete is injured; (d) when an athlete decides whether to complete their college education because their eligibility to play football is over.

**ANSWER**: Denied.

74.    The NCAA's Redshirt Rule also places athletes like Coley in a competitive disadvantage because players who redshirt are allowed to compete in at least four (4) games (and under the NCAA's current rules involving a college football playoff, all postseason competition) without losing a year of eligibility. However, players like Coley, whose participation in a full season of college football is limited because of injury lose a year of eligibility simply because they made an appearance in more than four (4) games, resulting in a reduction in the period of time that players like Coley can receive NIL Compensation. For players like Coley, that NIL Compensation can be substantial.

**ANSWER**: Denied.

75.    Coley's ambition, besides getting a college degree, has been to play professional football, and it is without question that participating in college football at the Division I level provides Coley with additional coaching, mentoring, training and exposure that enhances his potential to play professional football. The Challenged Rules reduce that potential, and therefore, affect Coley's future earning

potential, especially given that Coley is coming off an injury in his last season of eligibility pursuant to the current NCAA rules.

**ANSWER**: Denied as to the effect of the alleged "Challenged Rules."

Further, Defendant lacks knowledge or information sufficient to form a belief as to

the truth of the remaining allegations in Paragraph 75 and therefore denies them.

76.     The NCAA consistently advocates the benefits of competing in college athletics, regardless of whether an athlete plays professionally, representing that the value of college sports includes unparalleled exposure and experiences through the opportunity to "travel across the country and around the world for regular season contests, NCAA championships and foreign tours," which the NCAA represents can "open doors for the few who will compete professionally and the majority who will go pro in something other than sports."[4]

**ANSWER**: Admitted.

77.     The Challenged Rules deny those opportunities to athletes like Coley for at least one (1) additional year, given he does not fall under one of the exceptions including the "Covid Waiver" and/or the NCAA's Redshirt Rule.

**ANSWER**: Denied.

78.     Coley has missed what the NCAA defines as two (2) seasons during his college career and has resulted in significant lost opportunity to Coley which simply cannot be easily repaired. For athletes like Coley, missing any games in a season, much less what the NCAA defines as two (2) seasons, has a significant impact on his ability to provide his talents to NCAA Division I football programs, like NCSU, but also on his potential earning ability as a professional athlete, as each game in which Coley could not participate because of injury is a game in which he did not have the opportunity to show his talents to professional scouts and teams and the massive audience that makes up college football fans. Therefore, any season of Division I college football competition that athletes like Coley miss causes significant and irreparable harm to them.

**ANSWER**: Denied.

79.     The Challenged Rules restrain athlete's (like Coley's) services based upon arbitrary and anticompetitive rules with no pro-competitive justification. Furthermore, it restrains the number of athletes that participate and/or are eligible

---

[4] https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx

to play in college athletics; deprives athletes, like Coley, of the benefits of competition; restrains the ability of the athletes to benefit and profit from their NIL in Division I college football; restrains competition in NIL services among athletes, and additional revenue sharing.

**ANSWER**: Denied.

80.     As a direct and proximate result of the NCAA's actions, Coley has been, is being, and will continue to be, irreparably harmed.

**ANSWER**: Denied.

### Effect of the Challenged Rules on consumers of college football

81.     The Challenged Rules cause negative downstream effects on consumers who attend and/or watch college football games. Athletes like Coley who are prevented from competing simply because they appeared in more than four (4) games but less than an entire, complete season diminishes the value of the product provided by the NCAA and its member institutions, as NCAA member institutions are prevented from retaining skilled and experienced players like Coley, thereby increasing the prospect that they are less competitive than they otherwise would be, and college football fans lose the ability to see those athletes compete, with the risk of the product that is NCAA athletics becoming less desirable for consumers. College football players, like Coley, who have significant experience with the demands of being enrolled as a college student and participating in Division I football offer valuable leadership to their teams.

**ANSWER**: Denied.

82.     With the departure of skilled defensive backs from NCSU via the transfer portal, losing Coley because he does not have an additional year of eligibility will require that NCSU find a replacement for him, instead of retaining Coley, a great player, leader and mentor that NCSU would like to have return for another year, the result of which, upon information and belief, being that in the defensive backfield, NCSU is less competitive.

**ANSWER**: Defendant lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 82 and therefore denies them.

### Lack of any pro-competitive justification

83.     There is no procompetitive justification for the Challenged Rules. Because the above demonstrates the anti-competitive effect of these Rules on the Division I labor market for football players, like Coley, and the consumer market for

persons watching college football, the burden shifts to the NCAA to prove a procompetitive justification for the Challenged Rules.

**ANSWER**: Denied.

84.    If history repeats itself, the following justifications may be offered by the NCAA.

**ANSWER**: Denied.

85.    Upon information and belief, the NCAA will contend that the Challenged Rules promote the academic well-being of college athletes; preserves the amateurism model of the NCAA; increase the number of students who compete in Division I football; and/or "foster better alignment between athletics and academics; all of which are pretextual.

**ANSWER**: Denied.

86.    In guidance to college athletes on the transfer process, the NCAA has stated that its Eligibility Clock is "designed to move student-athletes toward graduation in a timely manner," without defining what it means by "timely." However, the Challenged Rules do nothing to help an athlete earn a degree in four (4) years. The fact remains that more than 50% of college students who are not college athletes participating in a Division I sport take more than four (4) years to complete their degree.[5] Coley has vigorously pursued his college degree, but the time and attention that he has been required to devote to being a Division I college football player has made completing his degree in four (4) years impossible.

**ANSWER**: Denied.

87.    The Challenged Rules do not aid in maintaining any concept of "amateurism," which the NCAA has not and cannot define. However, NCAA Bylaw 12.12 still requires that a Division I college athlete maintain "amateur" status in order to maintain his/her eligibility to participate in college athletics, and Coley has done nothing to compromise that status, as he has not: (a) used his athletic skills, directly or indirectly, for pay in football; (b) accepted a promise of pay; (c) signed a contract or commitment of any kind to play professional athletics; (d) received, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation; (e) competed on any professional athletics team; (f) entered into a professional draft; or (g) entered into any agreement with an agent.

---

[5] https://www.cnbc.com/2019/06/19/just-41percent-of-college-students-graduate-in-four-years.html

**ANSWER**: Denied.

88.     Upon information and belief, any arguments by the NCAA to the contrary are pretextual and do not justify such anticompetitive restrictions.

**ANSWER**: Denied.

89.     Any supposed benefits in the market for consumers of college athletics generally and college football specifically, do not counterbalance the harm in the distinct, sport-specific markets for an athlete's labor. Any supposed consumer desire for college athletes to complete their college education within four or five years cannot balance against the harm caused to those students through elimination of their ability to earn NIL Compensation. Instead, the burden is upon the NCAA to show that its Bylaws have a procompetitive effect in the damaged market; in this case, the labor market for Division I college football players.

**ANSWER**: Denied.

90.     The Challenged Rules have nothing to do with college athletes maintaining "amateur" status, regardless of how that term is defined by the NCAA.

**ANSWER**: Denied.

### Availability of less restrictive means

91.     Even if the NCAA were to establish that the Challenged Rules had a valid, procompetitive justification (which Coley denies), those stated goals by the NCAA (academic and amateurism goals) could be accomplished through less restrictive alternatives.

**ANSWER**: Denied.

92.     The NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. See NCAA Bylaw 14.4.1. Other NCAA Bylaw provisions require minimum credit hours and grade point averages to be eligible for competition. These Bylaw provisions accomplish the NCAA's academic and undefined amateurism goals, without the restrictions imposed by the 5 Year Rule.

**ANSWER**: Denied.

93.     Furthermore, increasing the number of "seasons" a college athlete could compete would accomplish the NCAA's goals through less restrictive alternatives.

**ANSWER**: Denied.

94.     The NCAA could also create a meaningful exception for athletes, like Coley, that do not fit into any current exception/waivers of the 5 Year Rule, and whose circumstances (injury) prevented them from cumulatively participating over their college career in more than a season of competition as defined by the NCAA, circumstances that impacted their performance, playing time, opportunities and NIL compensation based upon arbitrary and unequal eligibility rules.

**ANSWER**: Denied.

95.     Creating an additional meaningful exception that athletes, like Coley, would/could satisfy would be less restrictive means to accomplish any procompetitive reason alleged by the NCAA.

**ANSWER**: Denied.

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act

96.     Coley incorporates herein by reference the allegations contained in paragraphs 1 through 95 as if fully set forth herein.

**ANSWER**: Defendant incorporates and realleges its answers to all preceding

paragraphs as if fully set forth in this answer.

97.     There can be no reasonable dispute that the NCAA and its member institutions amount to a "combination, contract, or conspiracy." See *Alston*, 594 U.S. at 85, 107 (affirming district 3's entry of a permanent injunction against the NCAA in a case brought under the Sherman Act).

**ANSWER**: Denied.

98.     NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Challenged Rules. Specifically, the NCAA unlawfully restrains the ability of Division I college athletes, like Coley, to play for the same number of games and years offered to other college football players who completed four (4) full seasons, or who have taken advantage of the NCAA's arbitrarily created exceptions, including the Redshirt and "Covid Waiver" rules or those who did not otherwise participate in more than four (4) games in any "season."

**ANSWER**: Denied.

99.     The restraint imposed by the Challenged Rules cannot withstand analysis under the Rule of Reason.

**ANSWER**: Denied.

100.    The Division I football market is the relevant antitrust market, and the transactions between NCAA college football players and the NCAA member institutions are commercial in nature and fall within the purview of the Sherman Act. As a result of the NCAA's unreasonable restraint on trade, it has caused an injury on the market, which for purposes of this matter, is Division I football.

**ANSWER**: Denied.

101.    The NCAA and its member institutions have the power to restrain, and have restrained, the eligibility requirements of college football players, like Coley, and are able to do so in any way and at any time they wish without any meaningful risk of diminishing their market dominance.

**ANSWER**: Denied.

102.    Accordingly, the NCAA and its member institutions collectively enjoy monopsony power in the market for athletes, like Coley, such that their restraints can (and do) harm competition. Specifically, as it relates to this matter, restraints by the NCAA on an athlete's eligibility, in turn directly affects competition.

**ANSWER**: Denied.

103.    These horizontal agreements among horizontal competitors are unlawful and unreasonably restrain competition among Division I members competing in the relevant markets, because under the Challenged Rules, NCAA member institutions are prohibited from retaining the services of college football players who have played four (4) seasons, like Coley. Such rules pose a competitive disadvantage to college football players like Coley, who have not completed four (4) complete seasons of college football due to injury, but who seek to continue to play college football for a fifth season while continuing to pursue their educational goals. Such a limitation creates a disadvantage to players, like Coley, who participate and compete in less than four (4) complete seasons. Furthermore, the Challenged Rules prevent football players, like Coley, from competing in college football for the same period of time available to other college football players who, for example, take advantage of the NCAA's Redshirt or "Covid Waiver" policy and compete for at least five (5) seasons.

**ANSWER**: Denied.

104.    As a direct and proximate result of the NCAA's conduct in the enforcement of the Challenged Rules, college football players who seek to continue to play college football beyond the period of time that the NCAA defines as four (4) "seasons," who are otherwise enrolled in college, and consumers of college football, have suffered and will continue to suffer antitrust injury due to the reduction in competition among Division I schools for these college athletes through the restrictions imposed by the 5 Year Rule.

**ANSWER**: Denied.

105.    There are few, if any, benefits to competition in Division I football to the NCAA's member institutions that are created by the existence and enforcement of the Challenged Rules, or to those consumers of NCAA Division I football, and any such benefits are outweighed by the harm and restraints to competition and to the college football players that are subject to the Challenged Rules.

**ANSWER**: Denied.

106.    As set forth above, there exist less restrictive alternatives that are available to the NCAA to accomplish its goals, and the NCAA's rules can be modified to address any such concerns.

**ANSWER**: Denied.

107.    Unless injunctive relief is granted, the NCAA's conduct is ongoing and will continue to inflict injury upon current NCAA college football players, including Coley. The direct harm caused to Coley from the Challenged Rules is obvious as it denies him the opportunity to continue to play sports and prevents him from signing agreements with NCSU or any other Division I member institution for NIL Compensation beyond the 2024 football season and limits the numerous opportunities that he will have as a member of the NCSU or another Division I football team for the 2025 season to demonstrate his abilities to play professionally and does so as an unreasonable restraint on the labor markets for college football players.

**ANSWER**: Denied.

108.    The anticompetitive acts of the NCAA and its member institutions are intentionally directed at the United States and have a substantial and foreseeable effect on interstate commerce.

**ANSWER**: Denied.

#523250394_v1

109. There is no question but that the NCAA and its members hold monopsony power over the labor market for college football and therefore have and exercise market power.

**ANSWER**: Denied.

110. The Challenged Rules force college football players, like Coley, to decide whether to attempt to obtain their college degree in four (4) years (while devoting their attention to the demands of being a Division I College football player), to forego a rigorous academic curriculum that would take them longer than four (4) years to complete, or to even change their majors. To the contrary, other athletes that have benefited from the NCAA's Red Shirt Rule, or who have the opportunity to take advantage of the NCAA's "Covid Waiver," are not faced with the same dilemma. Therefore, the 5 Year Rule harms college football athletes, including Coley, when they are making decisions about their education which the NCAA proclaims is so vital to their future.

**ANSWER**: Denied.

111. The effects on the labor market also causes downstream effects for consumers of college football because the Challenged Rules harm the competitiveness of NCAA football teams by limiting the number of years that college football players can compete at the Division I level, and therefore, limits the labor market for college football players.

**ANSWER**: Denied.

112. Any assertion by the NCAA that any anticompetitive harm is personal to Coley and not the market is false and does not address the competitive harm in the market for NCAA Division I college football players by limiting participation to four (4) seasons, and ignores the economic reality that exists in this age of NIL Compensation, as any rules that restrict who can compete (and therefore, earn NIL Compensation) and for how long they can compete necessarily has anticompetitive effects.

**ANSWER**: Denied.

113. Restricting the eligibility of NCAA Division I college football players to four (4) years simply is not relevant to the product that is NCAA Division I football. There are numerous reasons why "athletes may be older and stronger than those on a traditional trajectory – military service, religious obligations, professional careers in other sports, or even independent athletic or academic work." *See Pavia v. Nat'l Collegiate Athletic Ass'n,* No. 3:24-CV-01336, 2024 WL 5159888, at *11 (M.D. Tenn. Dec. 18, 2024). "Given the different treatment of other student-athletes with comparable or more post-secondary experience, the NCAA's assertion that the

29

eligibility rules are necessary to prevent age and experience disparities and preserve the quality of experience for student-athletes falls flat." *Id.*

**ANSWER**: Denied.

114.    Currently, NCAA Division I football teams use the transfer portal to "fill roster spots for the next season…Those transfers – which are allowed by the NCAA – take a spot that might otherwise go to an incoming freshman player," so any argument that the 5 Year Rule "prevents more experienced athletes from 'crowding out' younger, less experienced athletes" ignores the reality that the NCAA's transfer portal rules have that same effect – "a school opting for a more experienced player." *Ohio*, 706 F.Supp.3d at 569. 115. Strict adherence to the Challenged Rules giving athletes only four (4) seasons of competition, does not have procompetitive benefits, and does not maintain the NCAA's goal of maintaining a "natural and standard degree progression." Achieving a degree in four (4) years, especially for Division I college football players, is not "natural and standard." The NCAA's rules concerning eligibility have "evolved over time." The NCAA rules were amended to "allow NCAA Division I football players another half season (or potentially more) of play through the NCAA Redshirt Rule (NCAA Bylaw 12.8.3.1.6), which allows football players to play up to four games per season without losing a year of eligibility." Then, in August of 2024, the NCAA expanded that amount of playing time when it passed Bylaw 17.11.6.2.1, "which excluded all post-season competition from the Redshirt Rule. This resulted in an increase in the number of games that can be played in an exempt season from four games to a potential of nine games." *Pavia* at *11.

**ANSWER**: Denied.

116.    The recent rule changes by the NCAA that allows athletes "unlimited transfers between schools" do not support the NCAA's stated goal of maintaining 'natural and standard degree progression." *Pavia* at *12. That "stated goal" is a "mere pretext" to justify the Challenged Rules, especially in the case of Coley, who has maintained a concerted path towards getting his college degree while balancing the rigors of being a Division I college football player.

**ANSWER**: Denied.

117. "Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." *Pavia* at *12; *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 597 (N.D.W. Va. 2023)(citations omitted). Coley's lost opportunity to continue to play Division I college football at NCSU or some other Division I program results in a lost opportunity for exposure and building his "personal brand."

**ANSWER**: Denied.

118.     Coley sought a waiver of the Challenged Rules from the NCAA almost immediately at the conclusion of the 2024 college football season, and actually, before the NCAA college football playoffs were over. There can be no argument that Coley's seeking of a waiver was timely, given especially the announcement by the NCAA "that it was considering providing five seasons of eligibility to athletes over the course of five years." *Pavia* at *13.

**ANSWER**: Denied.

119.     It is unlikely that this case can be resolved prior to the beginning of the 2025 NCAA college football season. For NCSU, "spring practice" begins in March 2025; pre-season practice begins in July 2025; and NCSU's 2025 football season begins in August 2025. Coley will suffer irreparable harm before this case can be resolved on the merits if he cannot fully participate as a member of NCSU's football team.

**ANSWER**: Denied.

120.     The balance of the equities and the public interest weigh in favor of the injunctive relief sought by Coley. Coley seeks injunctive relief that is extremely narrow in scope – to prohibit the NCAA from enforcing Bylaw 12.8, *et. seq.* so as to allow him to play next season and prohibiting the NCAA from taking any enforcement action against NCSU if it allows him to do so under its "Rule of Restitution."

**ANSWER**: Denied.

121.     The NCAA nor anyone else will suffer any substantial harm if injunctive relief is granted, given especially that the NCAA is already actively considering allowing college athletes a fifth (5th) year of eligibility. The balance of equities favors granting preliminary and permanent injunctive relief, and the public interest is served by promoting free and fair competition in the labor markets.

**ANSWER**: Denied.

122.     Accordingly, Coley seeks a preliminary injunction and permanent injunction, enjoining the NCAA from violating Section 1 of the Sherman Act by enforcing the 5 Year Rule (NCAA Bylaw 12.8, et. seq.) as to Coley and from enforcing NCAA Bylaw 12.11.4.2 to punish Coley or NCSU for any actions taken by them in compliance with any orders from this Court. Accordingly, Coley requests that this Court enter an order specifically finding that he is eligible to play Division I college football in the 2025-26 academic year.

**ANSWER**: Denied as moot.

## AFFIRMATIVE DEFENSES

1.      Plaintiffs' claims challenge only non-commercial activity not subject to the antitrust laws.

2.      Plaintiffs fail to allege proper relevant product and geographic markets.

3.      Plaintiffs' claims are barred on the ground that the acts complained of, to the extent they occurred, were procompetitive in nature, were done solely to promote, encourage, and increase competition, and had procompetitive effects that outweighed any alleged harm.

4.      Plaintiffs' claims should be barred because any action taken by or on behalf of the NCAA was justified, constituted bona fide business competition, and was ancillary to the pursuit of its own legitimate business and economic interests

5.      Plaintiffs' claims should be dismissed because Plaintiffs have not suffered actual, cognizable antitrust injury of the type antitrust laws are intended to remedy.

WHEREFORE, Defendant National Collegiate Athletics Association requests that Plaintiffs' complaint be dismissed and it be awarded its cost in this action, and for such other relief  this court deems appropriate.

Respectfully submitted this the 20th day of June, 2025.

HOLLAND & KNIGHT LLP

By: */s/ Nishma Patel*
Thomas R. Woodrow, N.C. Bar No. 58622
Nishma Patel, N.C. Bar No. 50922
HOLLAND & KNIGHT, LLP

#523250394_v1

1120 S. Tryon Street, Suite 900
Charlotte, NC 28203
T: 980.215.7828
F: 980.215.7771
tom.woodrow@hklaw.com
nishma.patel@hklaw.com

/s/ J. Douglas Minor, Jr.
J. Douglas Minor, Jr. (*pro hac vice*)
Holland & Knight LLP
1180 W. Peachtree Street, Suite 1800
Atlanta, Georgia 30309
T: 404.817.8500
F: 419.241.6894
doug.minor@hklaw.com

*Attorneys for Defendant National Collegiate
Athletics Association*

**CERTIFICATE OF SERVICE**

I, Nishma Patel, certify that on June 20, 2025, a true and correct copy of the foregoing was served upon counsel of record via the Court's CM/ECF system.

/s/ Nishma Patel<br>Nishma Patel